UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                 :

MYRRHELEKI TURNER,                 :

                                 :

                 Petitioner,       :

                                 :             18 Civ. 492 (JPC)

          -v-                        :

                                 :              OPINION

HAROLD    GRAHAM,  *Superintendent  of  Auburn* :     AND ORDER
*Correctional Facility*,                   :

                                 :

                 Respondent.     :

                                 :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Following a 2015 jury trial in New York state court, Petitioner Myrrheleki Turner was convicted of attempted second degree murder and two counts of criminal possession of a weapon in the second degree and sentenced to an aggregate term of twenty years' imprisonment. Turner's conviction arose from his near-fatal shooting of a man named Lucian Rogers at a park in Harlem on the night of March 11, 2014. The proof against Turner relied heavily on the eyewitness testimony of Evilla Roebuck, a long-term resident of the neighborhood who was standing close to Turner and Rogers at the time of the shooting. The trial court admitted Roebuck's grand jury testimony to establish the truth of her identification of Turner as the shooter, upon finding that Turner had intimidated and threatened Roebuck in connection with her trial testimony, thereby forfeiting his Sixth Amendment right to confront her at trial.

      Turner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the trial court's admission of Roebuck's grand jury testimony and raising several claims of ineffective assistance of counsel. For the below reasons, the Court denies Turner's petition.

# I. Background

## A. Factual Background

The following facts are taken from the evidence presented at Turner's trial, with all factual inferences drawn in Respondent's favor in light of the jury's guilty verdict. *See Quartararo v. Hanslmaier*, 186 F.3d 91, 96 (2d Cir. 1999). On the night of March 11, 2014, approximately forty to fifty people congregated at Donnellan Park in the Sugar Hill section of Harlem, many of whom were socializing, drinking alcohol, and smoking marijuana. *See* Dkt. 1 ("Petition"), Ex. A ("Trial Tr.") at 29-31, 165-66. Among those at Donnellan Park that night were Turner and Rogers.

After arriving at the park alone, Rogers eventually found himself conversing with Roebuck. *Id.* at 31, 39, 165-66. Roebuck had arrived at the park around 10:00 p.m. to have some cocktails. *Id.* at 29-30, 32. Known by many as "Auntie", Roebuck was popular in the neighborhood around Donnellan Park, having lived there for four decades. *Id.* at 24, 154. She served as tenant president in her apartment building and operated several watermelon stands in Manhattan and the Bronx. *Id.* at 24, 29, 155. Rogers and Roebuck had known each other for several years, and they would see or speak with one another frequently. *Id.* at 26-27, 154-55.

It appears Turner came to the Donnellan Park that night after Rogers and Roebuck were already there. *See id.* at 165-66. Turner and Rogers grew up in the same neighborhood in Harlem, were "friends," and "to a certain extent" "h[ung] out with the same crew of people." *Id.* at 152, 157-58. At some point, Turner and Rogers began to argue, the argument escalated, and a fist fight broke out. *Id.* at 31-32. Rogers was "getting the best of" Turner and landed two punches on him. *Id.* at 32-33, 76. Eventually, the fight subsided with Rogers victorious, and Rogers helped Turner off the ground. *Id.* at 33. Turner walked away, and Rogers remained next to Roebuck near the park's gate. *Id.*

About five minutes later, Turner returned with a gun.  Grand Jury Tr. at 7-8, 12-14; Trial Tr. at 45.[1]  He walked up to Rogers, while Rogers was near Roebuck, and fired a single shot at close range into Rogers's chest.  Grand Jury Tr. at 8-9, 13; Trial Tr. at 45-46, 57-58; *see also* Trial Tr. at 179-80.  The bullet went through Rogers's body and exited the back of his left arm, causing artery and nerve damage.  Trial Tr. at 181-82, 187.  Immediately after the shooting, Roebuck jumped over the gate with several other people and seriously injured her neck.  *Id.* at 33, 56.  Rogers meanwhile staggered out of the park and collapsed on the corner of 150th Street and St. Nicholas Place.  *Id.* at 102, 117, 182-83.  A passerby called 9-1-1, and an ambulance took Rogers to Harlem Hospital, where, after losing a considerable amount of blood, he had emergency surgery.  *Id.* at 103, 109-10, 148, 185-87.  He ultimately required multiple surgeries on his arm, and went about six or seven months without feeling in his arm and hand.  *Id.* at 187, 190.

New York City Police Department ("NYPD") Officer Carlos Pagan investigated the shooting.  *Id.* at 274-75.  Officer Pagan visited Rogers in the hospital, but Rogers was "uncooperative" and "wouldn't give [the police] details about the incident."  *Id.* at 277.  The investigation ultimately led the police to Turner.  *Id.* at 276.  For nearly three months thereafter, authorities attempted to arrest Turner.  *Id.* at 280.  Between March 21, 2014 and June 12, 2014, Officer Pagan went to Turner's address in Harlem approximately ten times, but never found him there.  *Id.* at 280-81.  NYPD Detective Joseph Condello of the Violent Felony Squad also visited Turner's apartment three times during this period but failed to locate him despite speaking with others who lived in his apartment.  *Id.* 334-35.  On June 12, 2014, the Violent Felony Squad finally found Turner in Harlem.  *Id.* at 278.  The next day, Officer Pagan conducted a police line-up in which Turner appeared with five other individuals that resembled him.  *Id.* at 88, 294-95.  Roebuck

---

[1] The transcript of Roebuck's grand jury testimony was filed with the Court under seal.

viewed the line-up and identified Turner as the man who shot Rogers.  *Id.* at 88-89, 295-96.  Officer

Pagan then arrested Turner.  *Id.* at 276.

## B.  Procedural History

### 1.  Relevant Trial Court Proceedings

Trial began in New York State Supreme Court, New York County, on March 11, 2015

before the Honorable Justice Ruth Pickholz.  *Id.* at 1.  The prosecution called several witnesses

including (1) Roebuck, (2) an EMT who treated Rogers, (3) the NYPD Sergeant who first arrived

at the scene of the crime, (4) the passerby who called 9-1-1, (5) Rogers, (6) an NYPD lab technician,

(7) Officer Pagan, and (8) Detective Condello.  The combined testimony of these witnesses

established that Rogers was shot, and nearly killed, after a physical altercation at Donnellan Park

on the night of March 11, 2014.  But with the exception of Roebuck, whose testimony is discussed

below, none of these witnesses identified Turner as the shooter.[2]  Turner did not call any witnesses

and did not present any evidence.

#### a.  Roebuck's Testimony

Prior to trial, Roebuck testified before the grand jury that Turner shot Rogers.  Grand Jury

Tr. at 8.  But at trial, she recanted this testimony.  Specifically, Roebuck testified at trial that she

knew Turner by the nickname "Link" and Rogers by the nickname "Cy", and that she saw the two

men fight on March 11, 2014.  *Id.* at 25-27, 32, 72.  She also testified that after Rogers prevailed in

the fight, Rogers helped Turner up and the two men shook hands.  *Id.* at 33, 74.  Then, shortly after

the fight ended, Roebuck saw a "flash" and a gun.  *Id.* at 33-34.  However, she declared she was

---

[2] Rogers did not want to testify and only testified because he had been subpoenaed.  Trial
Tr. at 159.  He did not identify his shooter on the witness stand.  *Id.* at 178.  Rogers claimed that
he had a fight with someone he had never met before and was shot at the conclusion of that fight,
but maintained that he did not get into an argument with Turner that night and that he was unable
to see the person who shot him.  *Id.* at 167-69, 178-79, 181-82.

"not going to say" who shot Rogers because she was "not 50 to 100 percent sure," attributing her faulty memory to alcohol consumption on the night of the shooting. *Id.* at 34-35. This testimony appeared to come as a surprise to the prosecutor, as Roebuck previously had identified Turner as the shooter in a photo array, in a live line-up, and before the grand jury. *See id.* at 61-62.

The prosecutor then asked Roebuck whether anyone approached her regarding her testimony. *Id.* at 35-36. She confirmed that a man known as "Black," whom she considered her nephew, *id.* at 40, spoke to her "[a] couple of weeks ago," *id.* at 36. Roebuck explained that Black was "like family" to her because her mother raised him. *Id.* at 36-37. She also recently had learned that Black and Turner are cousins. *Id.* at 36. Black asked Roebuck whether she had been subpoenaed in this case, and she confirmed that she was. *Id.* at 38-39. According to Roebuck, Black told her "to make sure that, you know, if you are not sure let the courts know you are not sure" and that "if you are not sure let them know that . . . you are not 50 or 100 percent sure." *Id.* at 39. This "not 50 or 100 percent sure" was curiously identical to the very same language that Roebuck twice used moments earlier when she declined to say who shot Rogers. *See id.* at 34-35. Roebuck also stated that a woman known as "Bird," whom she had known for at least twenty years, also approached her approximately three weeks before the trial. *Id.* at 43-44. Bird informed her "that Black wanted [Bird] to tell [Roebuck] that [Black] had a few G's to put in [Roebuck's] pocket." *Id.* at 43-44. Roebuck clarified that she understood this to mean that Black wanted to give her $5,000, but Roebuck refused the money. *Id.* at 44.

In light of this testimony, the prosecutor asked Roebuck whether she recalled testifying before the grand jury that Turner shot Rogers. *Id.* at 45-46. Roebuck initially stated that she did not recall this. *Id.* at 46. The prosecutor then impeached Roebuck's credibility by reading the following exchange from Roebuck's grand jury testimony in which she referred to Turner and

Rogers by their nicknames, Link and Cy, respectively:

> [Q:]   [A]re you referring to Link?
> [A:]   Link came out of back, out of the building, he had, how I know what kind
>         of gun it was, it was a same gun the police officer had and I walked up to
>         Cy right beside me I could see the fire and hear the sound and he held it
>         sideways and shot him.  I jumped over the gate and ended up with a broken
>         neck.
> [Q:]   [W]ho shot who?
> [A:]   Link shot Cy."

*Id.* at 45-46.  At this point, these excerpts from Roebuck's grand jury testimony were read to impeach Roebuck, and were not offered as substantive evidence of the truth of her prior testimony. *See id.* at 137-38; *see also* Guide to N.Y. Evid. rule 8.33(2) ("If a witness testifies at a [criminal] proceeding and is subject to cross-examination concerning a statement made by the witness prior to the proceeding, the statement is admissible if the statement is inconsistent with the witness's testimony but solely for impeachment purposes.").  Roebuck testified that she did not recall this testimony and explained this was likely because she was "drinking every morning" at the time and had a "few cocktails" before testifying before the grand jury.  Trial Tr. at 47.[3]  Indeed, she stated that she had "been intoxicated for the last fifteen years" and "[t]he only day [she] was not intoxicated is right now," referring to her presence in court at trial.  *Id.* at 91.

The prosecution also challenged Roebuck's failure to identify Turner at trial based on her pre-trial identification of Turner as the shooter.  Roebuck acknowledged on the witness stand that, a few days after the shooting, she told the police that she saw Turner shoot Rogers.  *Id.* at 57.  On March 21, 2014, and ten days after the shooting, police officers then questioned Roebuck and showed her a photo array.  *Id.* at 84-86.  At trial, however, Roebuck stated that she did not recall

---

[3] While Roebuck initially claimed at trial that she did not recall identifying Turner as the shooter in her testimony before the grand jury, Trial Tr. at 46, she later testified that, although in the grand jury she "said [she had] seen Link," presumably referring to her identification of Turner as the shooter, she then had "to sit back and re-evaluate . . . to be sure," *id.* at 52; *see also id.* at 90 (admitting that she told the grand jury that Turner shot Rogers).

this. *Id.* at 84-85.  The prosecutor then showed Roebuck a document apparently containing the original photograph array in order to "refresh [her] recollection." *Id.* at 85.  He asked Roebuck if the document indicated that she wrote "that's who shot Cy and fighting Cy." *Id.* at 86.  She answered in the affirmative. *Id.*  She also acknowledged that, on June 13, 2014, she viewed a police line-up of people, and identified Turner as the person who shot Rogers. *Id.* at 88-89.

   b.  **The *Sirois* Hearing**

At the end of the trial day of Roebuck's testimony, the prosecutor requested a *Sirois* hearing[4] because Roebuck "testified on the stand that she had been subjected to people coming to her home" and "people offering her money not to testify," and this "very effectively made her unavailable to the prosecution."  Trial Tr. at 133; *see* Guide to N.Y. Evid. rule 8.02 (prior grand jury testimony of an unavailable trial witness is admissible if "the defendant engaged or acquiesced in wrongdoing that was intended to and did procure the unavailability of the witness").  When making this request, the prosecution also informed the court that recordings of Turner's jail phone calls revealed that he had directed certain individuals to influence Roebuck's testimony.  Trial Tr. at 133-35.

The trial court held the *Sirois* hearing on March 12, 2015, the day after Roebuck testified. *Id.* at 210-51.[5]  The hearing began with the prosecution playing tape recordings of some of Turner's

---

[4] Under New York law, if a court suspects that a defendant "by violence, threats or chicanery, caused a witness's unavailability," *People v. Cotto*, 92 N.Y.2d 68, 76 (1998), it may hold a *Sirois* hearing at which it must determine "whether the defendant actually did procure the absence of the witness, in which case the admission of un-cross examined testimony of the absent witness will be permitted," *Perkins v. Herbert*, 596 F.3d 161, 166-67 (2d Cir. 2010).  Such a finding requires "clear and convincing evidence" under New York law.  *People v. Geraci*, 85 N.Y.2d 359, 367 (1995); *see also* Guide to N.Y. Evid. rule 8.19 (explaining that a defendant forfeits his confrontation right if by clear and convincing evidence, he engaged in misconduct "aimed at least in part at preventing the witness from testifying" and this wrongdoing caused the witness "not to testify or testify fully").

[5] The *Sirois* hearing occurred in the middle of trial and thus is found in the trial transcript.

jail calls.  *Id.* at 211-16.  Because the transcripts of these calls are central to one of the main issues

in this case, large excerpts are reproduced below.[6]

The first call took place on December 22, 2014.  Dkt. 28-1 ("Telephone Tr.") at 1.  In this

phone call, Turner asked a man referred to as "G" if he could speak with Black.  *Id.*  Turner then

spoke with Black and said that he needed Black to talk to someone.  *Id.* at 2.  Black confirmed that

he would.  *Id.*  Excerpts from this transcript are as follows:

| | |
|---|---|
| Turner: | You got black number? |
| G: | Our cousin black?  Yea. |
| Turner: | Get him for me. |
| G: | Hold on. |
| Turner: | Tell him I need him to go talk to Bernard for me. |
| G: | Alright hold on. |

. . .

| | |
|---|---|
| Turner: | You been seeing Bernard? |
| Black: | Yea I spoke to him.  He just came home about three weeks ago. |
| Tuner: | Ah, he around right? |
| Black: | Yea yea, uhh umm.  Your big brother told me that situation.  I told him I'm *(unintelligible)*. |
| Turner: | Yea I need you, I need you, I need you to talk—I need to talk, I need you to talk to this |
| Black: | Alright alright.  You know you ain't gotta say that bro.  I already know the situation *(unintelligible)* told me that. |
| Turner: | Good lookin, I need you to do it ASAP though . . . like as fast as possible. |
| Black: | I'll personally go do it. |
| Turner: | Alright.  Thank you.  Appreciate you . . . . |
| Black: | I was already on the job once he told me. |
| Turner: | Good lookin . . . . |
| Black: | I talked to *(unintelligible)* I went and did that. |

*Id.* at 1-3.

---

[6] The Court made three alterations to the transcripts.  First, the Court refers to Turner by
name rather than "Defendant."  Second, the Court altered capitalization and punctuation in non-
material ways.  Third, the Court omitted ellipses found in the original transcript, and thus any
ellipses in the excerpts here represent omissions of words or phrases by the Court in quoting the
transcript text.

The second call occurred on January 1, 2015. *Id.* at 4. During this call, an unidentified male told Turner about someone he referred to as "Watermelon." *Id.* During the *Sirois* hearing, the prosecution argued that this was a reference to Roebuck, who sold that fruit around Donnellan Park. Trial Tr. at 243. Excerpts from this transcript are below:

| | |
|---|---|
| Unknown Male: | . . . So they started the trial or nah?  (*Unintelligible*). |
| Turner: | (*Unintelligible*).  I go back on the 20th I think.  But what's happening? |
| Unknown Male: | Shit happening over here.  I saw uh [PAUSE] Watermelon. |
| Turner: | Yea, what happened? |
| Unknown Male: | He dipped off real fast before I could say something to her.  I saw come down the block, I saw 'em, tried to walk past to catch up to him, he dipped off, jumped in a cab. |
| Turner: | A'right, it is what it is. |

. . .

| | |
|---|---|
| Turner: | Black said he already talked to him |
| Unknown Male: | (*Unintelligible*). |
| Turner: | So I don't know how to, ya know what I mean? |
| Unknown Male 2: | Yea. |
| Turner: | It is what it is.  [PAUSE].  Trying to get out of this nasty box though.  Know what I mean? |

Telephone Tr. at 4-5.

The next day, Turner made another phone call. *Id.* at 6. In this conversation, Turner spoke with G and an unknown male, who appeared to be the same unknown male from the prior day's call. *See id.* Turner referred to the conversation from the day prior and seemed to tell the man to attempt to talk to the husband of the person they referred to as "Watermelon." *See id.* Turner also reiterated to G to "[m]ake sure Black is on his job with what we're talking about." *Id.* Below are excerpts:

| | |
|---|---|
| Turner: | You might need to talk to the dude instead of talking to the talking to somebody else.  You remember what you told me yesterday, right? |
| Unknown Male: | Uh-huh. |

| | |
|---|---|
| Turner: | Couldn't catch nobody before they got in the cab?  You hear what the fuck I'm saying to you. |
| Unknown Male: | Yea I'm listening yo, I'm listening.   You not saying it clearly.  Say it again. |
| Turner: | You told me you tried to catch somebody before they got in the cab and you said you couldn't catch em. |
| Unknown Male: | Catch who? |
| Turner: | You said you was trying to catch somebody before they got in the cab but you couldn't catch em you was walking too slow? |
| Unknown Male: | Oh yea yea yea. |
| Turner: | Try hollerin at the motherfuckin um husband man. |
| Unknown Male: | Start hollerin at who? |
| Turner: | The husband. |

. . .

| | |
|---|---|
| Turner: | Make sure Black is on his job with what we're talking about.  You hear me . . . ? |
| G: | Yea I hear you. |
| Unknown Male: | Yea I hear you. |
| Turner: | Alright. |

*Id.* at 6-7.

The fourth call took place on January 9, 2015.  *Id.* at 8.  Here, an unidentified man told

Turner that Black "spoke to the person" on several occasions.  *Id.*  Excerpts are below:

| | |
|---|---|
| Turner: | When's the last time you talked to . . . Black . . . ? |
| Unknown Male: | I seen Black uhh [PAUSE] this week when I was at the house. |
| Turner: | What he was talking about? |
| Unknown Male: | . . . He hollers black and white personally, like no in between, he spoke to the person. |
| Turner: | A'right. |
| Unknown Male: | Personally. |
| Turner: | Alright. |
| Unknown Male: | More than once, you heard? |
| Turner: | Okay, you know you said it to me, ya know, it is what it is.  It's regular shit man.  It is what it is. |

*Id.*

On January 21, 2015, Turner made the final phone call relevant to this matter.  *Id.* at 9.  In

this conversation, Turner told an another individual to tell Black that Turner received a trial date

and to "[t]ell him to keep doing what he's doing." *Id.* Turner then used a basketball analogy to express urgency. *Id.* at 9-10.

| | |
|---|---|
| Turner: | You been seeing Black? |
| Unknown Male: | Yea I, I been seeing him a lot of him in the car. |
| Turner: | Alright. Tell him I got a, I got a trial date for the seventeenth. |
| Unknown Male: | Alright. |
| Turner: | Ya know what I mean?  Tell him to keep doing what he's doing.  Ya dig? |
| Unknown Male: | Yeah. |

. . .

| | |
|---|---|
| Turner: | Make sure you tell Black what I said too . . . . |
| Unknown Male: | I gotchu . . . . |
| Turner: | Ya know, I really need need the motherfuckers.  Tell them . . . there's 30 seconds left in the ballgame shot clocks at ten, ya heard? |
| Unknown Male: | I gotchu.  *(Unintelligible).* |
| Turner: | . . . down two points.  We need this basket man.  For real for real . . . . |

*Id.*

Next, Officer Pagan testified.  Trial Tr. at 216-24.  Officer Pagan said that while he was with the prosecutor that morning, which was the day after Roebuck testified, Roebuck called the prosecutor's cellphone.  *Id.* at 217.  The prosecutor's cellphone was on speaker, allowing Officer Pagan to hear the conversation.  *Id.*  During the phone call, Roebuck stated that after she left court the day prior, she received a phone call from Black and Bird during which Bird told Roebuck "[t]o keep her name out of court."  *Id.* at 218.  According to Officer Pagan, Roebuck also stated that later that day, "she was approached by a young guy" at a grocery store.  *Id.* at 219.  She recognized the man from the neighborhood and "said she kn[ew] him as OYG," which Officer Pagan explained was an acronym for a Harlem-based gang called Original Young Gangsters.  *Id.*  This man "asked [Roebuck] if she was in court yesterday."  *Id.*  Finally, Roebuck also informed the prosecutor that her brother in Baltimore "was receiving phone calls for a couple of months but that he didn't know

why until yesterday." *Id.* at 220.  Roebuck spoke with her brother on March 11, 2015 and "she told

him that she was in court and then he stated, oh that is why I was getting phone calls for a couple

months." *Id.*  Roebuck claimed that in those phone calls "they were telling her brother . . . for Miss

Roebuck not to testify in court." *Id.*  Turner did not call any witnesses at the *Sirois* hearing.  *See*

*id.* at 226.

After hearing arguments from the parties, *id.* at 226-51, Justice Pickholz ruled that the

prosecution had shown "by clear and convincing evidence that the defendant did intimidate [and]

threaten" Roebuck, *id.* at 266.  In support of her decision, Justice Pickholz explained that she had

reviewed the phone calls that Turner made while in prison and relied on her observation of Roebuck

from her testimony in court.  *Id.*  She found that Roebuck "was clearly not truthful on the witness

stand, and she was doing everything she could to say that she was drunk.  She was intoxicated.  She

needed a cocktail.  This was the only day she didn't drink."  *Id.*  Further, Justice Pickholz found "it

very telling that the day after [Roebuck] testified[,] [Roebuck] called the [prosecutor] to tell him

that she had been approached, and it was clear to [the court] that [Roebuck] did so because she

wanted to let somebody know that she was still being threatened although she didn't want to say in

court her true testimony."  *Id.* at 267.  As a result, Justice Pickholz allowed Roebuck's grand jury

testimony to be admitted as substantive evidence.  *Id.* at 266.

### c.  The Jury Verdict

On March 18, 2015, the jury returned a verdict finding Turner guilty of the two counts of

criminal possession of a weapon in the second degree.  *Id.* at 511-12.  The next day, after further

deliberation, the jury found Turner guilty of the remaining count of attempted murder in the second

degree.  *Id.* at 520.  Turner was later sentenced to an aggregate prison term of twenty years.  *See*

Petition ¶ 25.

### 2. Direct Appeal

Turner appealed his conviction to the Appellate Division for the First Department, challenging the trial court's admission of Roebuck's grand jury testimony.  On October 20, 2016, the Appellate Division held that "[t]he court properly permitted the [prosecution] to introduce an eyewitness's grand jury testimony as evidence-in-chief to establish defendant's guilt."  *People v. Turner*, 39 N.Y.S.3d 439, 439 (App. Div. 2016).  Specifically, the court found that "[t]here was ample circumstantial evidence, including defendant's recorded phone calls and reasonable interpretations thereof, to support the conclusion that defendant, acting through proxies, influenced the witness to give false trial testimony, thereby rendering her effectively unavailable, and that the change in her testimony could only be explained by this unlawful influence."  *Id.* at 439-40 (internal citations omitted).  On January 17, 2017, the New York Court of Appeals denied Turner's application to appeal the Appellate Division's decision.  *People v. Turner*, 28 N.Y.3d 1151 (2017).

### 3. New York Criminal Procedure Law Section 440.10 Motion

On January 15, 2018, Turner filed in state court a motion to vacate his judgment of conviction pursuant to New York Criminal Procedure Law § 440.10.  *See* Dkt. 16 ("Supplemental Petition") ¶ 5; Dkt. 24 ("Opposition") at 6.[7]  In this motion, Turner argued that he received ineffective assistance of counsel at trial because his trial attorneys failed to call witnesses at the *Sirois* hearing and did not object to Roebuck's impeachment during which the prosecutor introduced evidence of a pretrial photographic identification.  *See* Supplemental Petition ¶ 5; Opposition at 6.

On March 5, 2018, Turner filed a supplemental § 440.10 motion in which he argued that he

---

[7] Turner did not submit to the Court several relevant filings pertaining to his § 440.10 motion.  For this procedural history, the Court therefore largely relies on undisputed representations in Turner's and Respondent's briefs to this Court.

also received ineffective assistance of counsel because his trial attorneys failed to investigate or present an alibi defense that suggested he was in the Bronx at the time of the shooting. Supplemental Petition ¶¶ 8, 15.  In late May 2018, Justice Pickholz summarily denied Turner's claims raised in his initial § 440.10 motion, but ordered an evidentiary hearing regarding his alibi claims raised in his supplemental motion.  Supplemental Petition ¶ 9; Opposition at 6.  Following a hearing, Justice Pickholz denied Turner's supplemental § 440.10 motion on November 14, 2018. Supplemental Petition, Exs. J, K.

Turner sought leave to appeal this decision, Supplemental Petition, Ex. L, but the Appellate Division denied his application on March 28, 2019, Supplemental Petition, Ex. N.  He then applied for leave to appeal to the New York Court of Appeals, Supplemental Petition, Ex. O, and the Court of Appeals dismissed this application as "not appealable" on July 17, 2019, Supplemental Petition, Ex. P.

### 4. Federal Habeas

On January 19, 2018, and four days after filing his initial § 440.10 motion, Turner filed in this Court a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In this petition, Turner raises two arguments.  First, he argues that the trial court's admission of Roebuck's grand jury testimony violated his Sixth Amendment right to confront witnesses against him.  Petition at ¶¶ 34-42.  Second, he argues that he was denied his right to effective assistance of counsel because his trial attorneys failed to call witnesses during the *Sirois* hearing and failed to object to the prosecution's use of Roebuck's pretrial photographic identification.  *Id.* ¶¶ 43-72.  In other words, he makes the same arguments that he raised in his direct appeal and initial § 440.10 motion in New York state court.

On March 12, 2018, and one week after he filed his supplemental § 440.10 motion, Turner

14

sought permission to file a supplemental § 2254 petition and requested an order holding his initial petition in abeyance pending the resolution of his § 440.10 motion in New York state court. Dkt. 6. The Honorable J. Paul Oetken granted this on March 15, 2018 and ordered that this action be held in abeyance pending the outcome of Turner's state court proceedings. Dkt. 7.

On July 22, 2019, and five days after the New York Court of Appeals dismissed Turner's application for leave to appeal the denial of his § 440.10 motion, Turner supplemented his § 2254 petition in this Court. Supplemental Petition ¶ 1. In that filing, Turner raises the same argument he advanced in his supplemental § 440.10 motion, namely that he was denied effective assistance of counsel because his trial attorneys failed to investigate or advance his claimed alibi defense. *Id.* ¶¶ 37-110.

On March 24, 2020, Respondent Harold Graham, superintendent of Auburn Correctional Facility, filed an answer and a memorandum of law opposing all arguments Turner raised in his habeas petition. Dkt. 24. Turner filed a reply on April 6, 2020. Dkt. 25. This case was reassigned to the undersigned on September 29, 2020.

## II. Legal Standard

Pursuant to § 2254, a federal court may issue a writ of habeas corpus to a person held "in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Because Turner filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), it is "subject to review under the standards established in that Act." *Murden v. Artuz*, 497 F.3d 178, 191 (2d Cir. 2007).

Under AEDPA, a federal court may grant habeas corpus relief only if a claim that was adjudicated on the merits in state court "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).  With regard to § 2254(d)(1), a state court decision is "contrary to" established Supreme Court precedent "if it applies a rule that contradicts the governing law" set forth in a Supreme Court case or if it confronts facts that are "materially indistinguishable" from a Supreme Court decision but "reaches a different result."  *Brown v. Payton*, 544 U.S. 133, 141 (2005).  A state court decision "involves an unreasonable application of" Supreme Court precedent if the state court applies Supreme Court precedent to the facts at issue "in an objectively unreasonable manner."  *Id.*  State court factual findings are "presumed to be correct" unless the petitioner rebuts the findings with "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

AEDPA thus "dictates a highly deferential standard for evaluating state-court rulings," which "demands that state-court decisions be given the benefit of the doubt."  *Bell v. Cone*, 543 U.S. 447, 455 (2005) (per curiam) (internal quotation marks and citations omitted).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

### III.  Discussion

Turner raises two arguments for why he is entitled to a writ of habeas corpus.  First, he claims that the trial court violated the Sixth Amendment's Confrontation Clause when it admitted into evidence Roebuck's grand jury testimony.  Second, he contends that he was denied effective assistance of counsel guaranteed to him by the Sixth Amendment because his trial attorneys failed

16

to: (1) call witnesses during the *Sirois* hearing; (2) object to the prosecution's impeachment of Roebuck with her pretrial photographic identification of Turner; and (3) investigate or present his alleged alibi defense.  For the reasons stated below, each of these arguments fails under AEDPA's deferential review standard, and thus the Court denies Turner's petition in its entirety.

## A.  Confrontation Clause

Turner first argues that the state court violated the Sixth Amendment by allowing the prosecution to introduce Roebuck's grand jury testimony as substantive evidence of the truth of that prior testimony.   Petition at ¶¶ 34-42.   This argument fails because the state court's determination that Turner forfeited his right to confront Roebuck by attempting to influence her testimony was not contrary to clearly established federal law, but rather was consistent with Supreme Court precedent.  *See* Trial Tr. at 266-67.

The Sixth Amendment's Confrontation Clause states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The Amendment contemplates that a witness who makes testimonial statements admitted against a defendant will ordinarily be present at trial for cross-examination, and that if the witness is unavailable, his prior testimony will be introduced only if the defendant had a prior opportunity to cross-examine him."  *Giles v. California*, 554 U.S. 353, 358 (2008).

The Confrontation Clause is "most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding."  *Crawford v. Washington*, 541 U.S. 36, 54 (2004).  One of these founding-era exceptions is "forfeiture by wrongdoing."  *Id.* at 62.  At common law, this exception "permitted the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means of procurement' of the defendant."  *Giles*, 554 U.S. at 359 (citations omitted); *see also Davis v. Washington*, 547 U.S. 813, 833 (2006)

("[O]ne who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation."); *Reynolds v. United States*, 98 U.S. 145, 158 (1879) (explaining that the Constitution grants a defendant "the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege"). This is essentially an "equitable" remedy. *Crawford*, 541 U.S. at 62. If a defendant intimidates a witness in order to prevent the witness from testifying against him, he forfeits his right to confront that witness, and the court may then admit prior testimonial statements from that witness even though the defendant lacked an opportunity to cross-examine.

The Supreme Court most recently addressed the bounds of this exception in *Giles*. In *Giles*, a man killed his ex-girlfriend, and prosecutors sought to introduce statements that the victim made to a police officer a few weeks before her murder regarding a domestic violence incident involving the defendant. 554 U.S. at 356-57. The trial court admitted these statements, and California's appellate courts concluded this did not violate the Confrontation Clause because the defendant forfeited his right to confront his ex-girlfriend by murdering her. *Id.* at 357. The Supreme Court reversed and held that such an exception to the Confrontation Clause was unknown at the time of the founding. *Id.* at 377. Instead, the Court emphasized that the forfeiture by wrongdoing exception applies only when the defendant caused the declarant's absence "for the purpose of preventing testimony." *Id.* at 368; *see also id.* at 359-60. Thus in *Giles*, the witness's murder alone, absent an indication that the defendant committed the murder to prevent her from testifying, was insufficient to trigger the exception.

Here, the state court admitted Roebuck's unconfronted grand jury testimony for its truth because it found, by clear and convincing evidence, that Turner "did intimidate" and "threaten" Roebuck. Trial Tr. at 266. The court made this finding after conducting a hearing at which the

18

court listened to Turner's jail calls and received testimony from Officer Pagan, *id.*, and based on the court's observations of Roebuck on the witness stand, *see id.* ("I find that the witness was clearly not truthful on the witness stand, and she was doing everything she could to say that she was drunk."). The court further noted that the day after her testimony, Roebuck called the prosecutor about being approached, and found it "clear" that Roebuck "did so because she wanted to let somebody know that she was still being threatened although she didn't want to say in court her true testimony." *Id.* at 267. The Appellate Division affirmed this decision and concluded that Turner's "recorded phone calls" supported the finding that Turner, "acting through proxies, influenced the witness to give false trial testimony, thereby rendering her effectively unavailable." *Turner*, 39 N.Y.S.3d at 439.

Because this claim was thus adjudicated on the merits in state court proceedings, and Turner does not contend otherwise, the highly deferential standard of 28 U.S.C. § 2254(d) applies. Turner relies on § 2254(d)(1) and seems to argue both that the state court's decision here was "contrary to" and an "unreasonable application of" *Giles* and other Supreme Court jurisprudence on the Confrontation Clause. *See* Petition at 9 ("[T]he New York state court's decision was contrary to clearly established federal law[.]") (capitalization omitted); *id.* ¶ 42 ("[T]he New York appellate courts unreasonably applied Giles and existing Supreme Court jurisprudence on the Confrontation Clause to the instant case."). Both arguments fail.[8]

With regard to his first argument, Turner does not suggest that the facts here were "materially indistinguishable" from a Supreme Court decision, so his claim that the state court's

---

[8] Turner does not challenge the notion that a witness who testifies at trial, as Roebuck did here, still can be considered "unavailable" for Confrontation Clause purposes. The Court therefore does not consider this issue and assumes that Roebuck was "unavailable" for purposes of applying Sixth Amendment precedents. *See Cotto v. Herbert*, 331 F.3d 217, 234 n.7 (2d Cir. 2003). Turner also does not argue that Roebuck's statements to the grand jury were not "testimonial," and the Court similarly concludes that they were. *See Crawford*, 541 U.S. at 68.

decision was "contrary to" federal law must rest on the idea that the state court applied a rule that "contradicts the governing law." *Brown*, 544 U.S. at 141.  However, the Supreme Court has made clear that "one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation." *Davis*, 547 U.S. at 833.  And *Giles* clarified that the forfeiture by wrongdoing exception applies only "when the defendant engaged in conduct designed to prevent the witness from testifying." *Giles*, 554 U.S. at 359 (emphasis omitted).  Here, the trial court conducted a *Sirois* hearing to determine whether Turner had intimidated Roebuck from inculpating him at trial before it held that Roebuck's prior testimonial statements could be admitted.  Thus, the state court did not contradict governing law.  Instead, it applied the forfeiture by wrongdoing exception as it existed at common law and in line with Supreme Court precedent.  *See Giles*, 554 U.S. at 359, 368; *Davis*, 547 U.S. at 833; *Crawford*, 541 U.S. at 62; *Reynolds*, 98 U.S. at 158-59.

Turner's second argument rests on the possibility that the state court unreasonably applied *Giles* and other Supreme Court Confrontation Clause jurisprudence because the evidence did not show that Turner intended to intimidate Roebuck to not testify.  Petition ¶¶ 41-42.  The Court reiterates that for relief under AEDPA, Turner must demonstrate that the state court applied the law "in an objectively unreasonable manner." *Brown*, 544 U.S. at 141.  And a state court's decision "is not unreasonable if 'fairminded jurists could disagree on [its] correctness.'" *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (alteration in original) (quoting *Richter*, 562 U.S. at 101).  The Appellate Division's conclusion that the trial court did not err because there was "ample circumstantial evidence," such as Turner's many recorded phone calls, showing that Turner "act[ed] through proxies" to influence Roebuck to give false trial testimony, *Turner*, 39 N.Y.S.3d at 439, is far from an unreasonable application of *Giles* or earlier Confrontation Clause cases.  Instead, there is plenty of evidence in the record to support this determination.

Turner's jail calls, quoted in part above, show that he orchestrated Black's attempt to influence Roebuck.  Less than three months before trial began, Turner told Black he needed him to talk to someone, and Black assured him that he would "personally go do it."  Telephone Tr. at 3.  In the weeks that followed, Turner consistently asked others about Black, and was told that Black "spoke to the person" "[m]ore than once."  *Id.* at 8.  Another individual with whom Turner conversed referred to seeing someone he referred to as "Watermelon," *id.* at 4, and the prosecution argued before the state court that this was a coded reference to Roebuck, Trial Tr. at 243.  Turner never has attempted to explain what he and his associates were talking about during any of these phone calls or why the state court was wrong to conclude that they were plotting ways to intimidate Roebuck—not at the *Sirois* hearing and not before this Court.  Instead, Turner states that there simply was "no wrong doing on his behalf" during any of these phone calls.  Petition ¶ 39.  Such a conclusory statement does nothing to rebut the evidence on the record.

Besides the phone calls, Roebuck herself then confirmed that Black came to speak with her about her testimony a few weeks before trial and encouraged her to say that she was "not 50 or 100 percent sure" who shot Rogers.  Trial Tr. 38-39.  This was the very language Roebuck twice used on the witness stand when she declined to answer the question of who shot Rogers.  *Id.* at 34-35.  And Roebuck also stated that Bird attempted to bribe her with several thousand dollars on Black's behalf.  *Id.* at 44.

Under the deferential review demanded by AEDPA, the Court cannot say that "fairminded jurists" would disagree with the state court's finding that Turner's actions were intended to influence Roebuck and prevent her from testifying in a way that would inculpate him in the attempted murder.  *Richter*, 562 U.S. at 102.  In fact, the evidence more than supports the conclusion that Turner "engaged in conduct designed to prevent a witness from testifying."  *Giles*, 554 U.S. at

361.  Indeed, courts in this Circuit have concluded that state courts did not unreasonably apply the forfeiture by wrongdoing doctrine in similar circumstances.  *See Jernigan v. Brown*, No. 08 Civ. 9289 (JGK) (DF), 2012 WL 2377082, at *10 (S.D.N.Y. May 1, 2012) (rejecting the petitioner's Confrontation Clause argument because "there was an ample basis for the trial court to make its factual finding," such as "telephone messages that [p]etitioner left for [the witness], both prior to his indictment and afterwards, from prison"), *report and recommendation adopted* 2012 WL 2394405 (S.D.N.Y. June 25, 2012); *Drummond v. Cunningham*, No. 08 Civ. 4290 (KAM) (RLM), 2010 WL 5583116, at *9 (E.D.N.Y. Dec. 13, 2010) ("The *Sirois* hearing provided ample evidence of attempts to intimidate [the witness]; the timing of those threats, coupled with the role of petitioner's family and friend in attempting to influence [the witness], is sufficient to justify the trial and appellate courts' inference that petitioner likely knew of and acquiesced in those attempts."), *report and recommendation adopted* 2011 WL 132379 (E.D.N.Y. Jan. 17, 2011); *Brown v. Smith*, No. 06 Civ. 1429 (PKC), 2008 WL 4922014, at *10 (S.D.N.Y. Nov. 12, 2008) (finding the admission of a witness's grand jury testimony did not violate the petitioner's confrontation right because evidence presented at the *Sirois* hearing showed that the defendant's mother and girlfriend approached the witness with hostility, the defendant's private investigator repeatedly sought out the witness without leaving contact information, the witness received a threatening note and two bullets on her car windshield, and the defendant was aware of the witness from a police report); *see also Cotto v. Herbert*, 331 F.3d 217, 234 (2d Cir. 2003) (pre-*Crawford* case noting that "witness intimidation is the paradigmatic example of the type of 'misconduct' that can lead to the forfeiture of confrontation rights").  Similarly here, the state court's application of *Giles* and other Supreme Court cases regarding the forfeiture by wrongdoing doctrine was not

objectively unreasonable.[9]

Turner's primary argument to the contrary focuses on his mental state. He argues that the evidence at the *Sirois* hearing "did not show that [he] intended to prevent [Ms.] Roebuck from testifying." Petition ¶ 39; *see also id.* ¶ 41. True, the evidence presented was largely circumstantial and did not show Turner making direct threats toward Roebuck. However, "[i]ntimidation is rarely carried out face to face, especially when the intimidator is in custody, and even the agents of the intimidator rarely expressly state that they are agent[s] acting on the intimidator's behalf." *Breazil v. Superintendent Artis*, No. 15 Civ. 1912 (BMC), 2015 WL 9581816, at *7 (E.D.N.Y. Dec. 30, 2015). And Turner's jail calls, taken together, demonstrate his efforts to have Black convince Roebuck not to testify against him. Thus, for the reasons stated, the Court concludes that the state court did not unreasonably apply the forfeiture by wrongdoing doctrine here because evidence in the record clearly suggests that Turner intended "to prevent the witness from testifying" about his shooting of Rogers. *Giles*, 554 U.S. at 359.[10]

In sum, the Court concludes that Turner is not entitled to a writ of habeas corpus due to the

---

[9] In making its finding, the trial court also relied on the fact that Roebuck continued to receive threats after her testimony. *See* Trial Tr. at 267. These interactions carry less weight because they occurred after she took the stand and failed to identify Turner as the shooter. But still, these additional encounters suggest that there was a pattern of intimidation that did not cease after Roebuck's testimony in court concluded. The Appellate Division did not cite these events in its decision, and the Court finds that it is unnecessary to consider them because, even without that conduct, the trial court correctly applied the forfeiture by wrongdoing exception to the facts here.

[10] Turner does not appear to argue that this Court should grant the writ pursuant to 28 U.S.C. § 2254(d)(2) based on any "unreasonable determination of the facts" by the state court. To the extent that he does, this too fails. AEDPA commands that the Court presume that any factual determinations made by the state court are correct, and it is Turner's burden to rebut this by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). He fails to do so and instead relies on conclusory statements, such as insisting that the evidence at the *Sirois* hearing showed that "there was no wrong doing on his behalf." Petition ¶ 39. As recounted above, the mounds of evidence presented at trial and the *Sirois* hearing demonstrate the opposite is true, and thus Turner fails to show that the state court made any "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

state court's determination that he forfeited his right to confront Roebuck and decision to admit her grand jury testimony.  The Court thus denies habeas relief on this ground.

## B.  Ineffective Assistance of Counsel

Turner also argues that this Court should grant him a writ of habeas corpus because the state court violated the Sixth Amendment by denying him effective assistance of trial counsel.  Petition at ¶¶ 43-72; Supplemental Petition at ¶¶ 37-110.  As outlined below, each of Turner's arguments with regard to ineffective assistance of counsel fail to show he is entitled to this relief.

The Sixth Amendment provides that a defendant shall have "the [a]ssistance of [c]ounsel for his defen[se]."  U.S. Const. amend. VI.  The Supreme Court has recognized that "the right to counsel is the right to the *effective* assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (emphasis added).  In *Strickland v. Washington*, 466 U.S. 688 (1984), the Supreme Court articulated the test for determining whether a habeas petitioner was denied this right.  "To prevail on a claim of ineffective assistance of counsel, a convicted defendant must demonstrate that: (1) counsel's performance 'fell below an objective standard of reasonableness'; and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Rosas v. Artus*, No. 05 Civ. 8440 (RJS), 2013 WL 499610, at *4 (S.D.N.Y. Jan. 29, 2013) (quoting *Strickland*, 466 U.S. at 688, 694).  When reviewing trial counsel's performance, the Court must "be highly deferential," make "every effort . . . to eliminate the distorting effects of hindsight," and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.  Thus, "[s]urmounting *Strickland*'s high bar is never an easy task."  *Richter*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).  Indeed, the Court here must employ a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit

of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

Turner argues that he was denied effective assistance of trial counsel in three ways. First, he points to the fact that his trial counsel failed to call any witnesses, especially Roebuck, during the *Sirois* hearing. Petition ¶¶ 47-61. Second, he notes that his counsel did not object to the prosecution's impeachment of Roebuck through the use of a pretrial photographic identification. *Id.* ¶¶ 62-72. And third, in his supplemental submission, he focuses on his counsel's failure to investigate or present an alibi defense. Supplemental Petition ¶¶ 37-110. Each of these arguments fails to meet *Strickland*'s high bar for establishing a violation of this right.

### 1. *Sirois* Hearing

Turner's counsel did not call any witnesses at the *Sirois* hearing. *See* Trial Tr. 211-51. Turner takes issue with this, arguing had his counsel called Roebuck to testify at the hearing, he "would have been able to show the court that her testimony changed not because of any intimidation, violence, or threats; but rather because she was unsure if the defendant was in fact the shooter." Petition ¶ 59, *see also id.* ¶¶ 50-61. Turner further contends that Roebuck's testimony would have explained that she was intoxicated at all other times when she identified Turner as the shooter. *Id.* ¶ 59. Turner argues that he suffered prejudice because if Roebuck had testified at the *Sirois* hearing, the court would have concluded that she was not intimidated and thus could not have admitted her grand jury testimony, which was ultimately fatal to Turner's case. *Id.* ¶ 60.

The first problem with Turner's argument is that the court had already heard Roebuck's testimony because Roebuck testified at trial prior to the *Sirois* hearing. Indeed, the substance of Roebuck's trial testimony was exactly what Turner argues she needed to give at the *Sirois* hearing. And Justice Pickholz relied on that trial testimony in ruling that Roebuck's grand jury testimony

25

would be admitted as substantive evidence.  Trial Tr. at 267.  Turner seems to argue that if only Roebuck had repeated everything again, the outcome of the *Sirois* hearing would have been different.  The Court struggles to understand this logic.

For example, Turner contends that if his counsel called Roebuck at the *Sirois* hearing, she "would have been able to testify that she was drunk during the [g]rand [j]ury [t]estimony and that she was drunk the night of the incident which is why she mistakenly identified the defendant." Petition ¶ 52.  However, she gave testimony to this effect the day before the *Sirois* hearing.  *See, e.g.*, Trial Tr. at 35 (Roebuck testifying that she could not say if the shooter "was [Turner] or anyone else" because she was "drinking" that night); *id.* at 47 (Roebuck explaining she "had a few cocktails" before testifying before the grand jury).  At trial, Turner's counsel cross-examined Roebuck and elicited similar testimony:

> Q:     . . . Now, we have heard countless times you saying that you were intoxicated for the good majority of the time you spoke to the police and spoke to the [prosecutor] and testified, correct?
> A:     Yes.
> Q:     But you take it seriously so you are not intoxicated today, right?
> A:     No.
> Q:     You are clear headed today?
> A:     I can assure you I could sure use a cocktail right now.
> Q:     But you haven't had one today because you know how important this is?
> A:     Yes.
> Q:     You came to court clear headed today?
> A:     Yes.

*Id.* at 92.  Similarly, Turner argues that if Roebuck had testified at the *Sirois* hearing, she could have shown that she "was not intimidated."  Petition ¶ 60.  But again, she already stated this on the witness stand.  *See* Trial Tr. at 52 ("I'm not afraid.  What I got to be afraid of?").  It is difficult to see how the performance of Turner's counsel fell "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, by not calling Roebuck at the *Sirois* hearing to reiterate the exact same testimony she had given the day prior.

26

Turner's explanation for why he suffered prejudice is also hard to accept.  He contends that if Roebuck testified at the *Sirois* hearing, her grand jury transcript would not have been admitted as evidence.  *See* Petition ¶ 60.  He fails to explain why this is the case when all Roebuck would have done is restate everything she had already said under oath.  This is especially so when the court made clear that it considered Roebuck's testimony in making its decision to admit the grand jury testimony.  *See* Trial Tr. at 266 ("I obviously observed the witness on the stand when she testified.").

However, even if Roebuck had not already testified, the Court would still reject Turner's argument.  "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999) (quoting *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992)).  Thus, "counsel's decision as to 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'" *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (quoting *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997)).

Counsel's decision to not call Roebuck during the *Sirois* hearing was a strategic decision that is not exemplary of ineffective assistance.  Turner's counsel made a conscious decision to not call witnesses—Roebuck or otherwise—at the *Sirois* hearing.  When the prosecutor stated, "I assume the defense is not planning on calling anyone," defense counsel replied, "[t]hat's a correct assumption." Trial Tr. 226.  In denying Turner's initial § 440.10 motion, the state court saw no issue with counsel's strategic choice, and the court will not second guess this decision under the "doubly deferential" framework applicable here. *Burt*, 571 U.S. at 15.  Turner fails to show that his counsel's decision was outside the "wide range of reasonable professional assistance" or that he suffered any prejudice from this choice. *Strickland*, 466 U.S. at 689.  The Court thus declines to

grant a writ of habeas corpus based on this argument.[11]

### 2. Roebuck's Impeachment

Turner next argues that his trial counsel was ineffective because his counsel failed "to object to the introduction of the pretrial identification by the Prosecution in order to impeach" Roebuck. Petition ¶ 63. Turner claims that the prosecution's use of the pretrial photographic array at trial was a violation of New York Criminal Procedure Law § 60.35 and that his trial counsel "should have objected to the introduction of the pre-trial identification." *Id.* ¶ 67.

Respondent takes no position on whether this is correct. Instead, Respondent claims that this argument is "moot" because the court later admitted Roebuck's grand jury testimony. Opposition at 62. The Court understands this argument to essentially mean that Turner could not have been prejudiced by his counsel's failure to object to Roebuck's impeachment because the jury ultimately could consider Roebuck's testimony to the grand jury as substantive evidence inculpating Turner. Assuming, without deciding, that Turner's trial counsel should have objected to Roebuck's impeachment under New York law, the Court finds that Turner was not prejudiced by this because Roebuck's grand jury testimony identifying him as the shooter was later admitted as evidence against him. *See Strickland*, 466 U.S. at 694. Thus, because it is unlikely that the jury's verdict would have changed had the trial court precluded this line of impeachment, this argument

---

[11] Turner seems to argue in passing that his trial counsel was also ineffective because he failed to call other witnesses at the *Sirois* hearing, such as Black, Bird, and Roebuck's brother in Baltimore. Petition ¶ 51. Turner fails to develop this argument or explain why counsel should have called any of these witnesses. And the Court is hard pressed to see why calling any of these witnesses would have been an objectively good idea. Drawing the court's attention to Black and Bird, the very people that spoke to Roebuck about her testimony and attempted to bribe her, *see* Trial Tr. at 36, 39, 44, seems like a perilous strategy to say the least. The same would be true for calling Roebuck's brother, who apparently for months had been on the receiving end of threatening phone calls regarding Roebuck's testimony. *See id.* at 220. In all events, for the reasons stated above, the Court declines to second guess counsel's tactical decision to not call these witnesses at the *Sirois* hearing.

fails.

### 3. Alibi Defense

At some point after Turner filed his initial petition in this Court on January 19, 2018, and thus nearly three years after Turner's trial, Turner's habeas counsel "obtained new information that was previously unavailable" regarding "potential alibi witnesses who could have been called at [Turner's] trial." Supplemental Petition ¶ 7. Turner therefore supplemented his habeas petition to additionally argue that his trial counsel was ineffective for failing to investigate or advance an alibi defense centered on these witnesses.

#### a. Alleged Facts

This claim necessarily relies on alleged facts that were not presented at trial. The trial court held a hearing for Turner's supplemental § 440.10 motion, which was based on the same alibi theory. *See* Supplemental Petition, Ex. F at 21-134 ("§ 440.10 Hearing Tr."). At this hearing, four witnesses, including Turner, testified on Turner's behalf, and the prosecution called Turner's two trial attorneys. Turner also provided the state court with video surveillance footage from the night of the shooting. *See* Supplemental Petition, Ex. G; *see also* Dkt. 29. The below facts come from these sources.

The heart of Turner's claimed alibi defense is that shortly after 10:00 p.m. on the night of the shooting, Turner accompanied his friend Rondell Days to the home of Turner's cousin, William Smith, in the Bronx and remained there until approximately 2:00 a.m. Supplemental Petition ¶ 15 (citing § 440.10 Hearing Tr. at 9-10, 22). In other words, he could not have shot Rogers in Donnellan Park around 11:00 p.m. that night since he was with friends and family in a different borough of the City. Turner argues that he told his trial counsel this, but his counsel declined to pursue the theory, and that this amounted to ineffective assistance. *Id.* ¶¶ 97-99.

Specifically, the video surveillance showed Days enter Turner's apartment complex at 10:12 p.m. on March 11, 2014.  The two men left the apartment complex together at approximately 10:20 p.m. and headed uptown and away from Donnellan Park.  According to Days, he and Turner went to a corner store to purchase cigars and then hailed a taxi and took it to Smith's house in the Bronx. § 440.10 Hearing Tr. at 20-21.  Days testified that he, Turner, Smith, and a woman known as "Moody" remained there until at least 2:00 a.m.  *Id.* at 21.  Smith confirmed this.  *Id.* at 9-10.

Once Turner was arrested, Smith asked Rafael Muniz, Esq. to represent Turner.  *Id.* at 15. Muniz was relatively inexperienced, but met Turner for an initial interview.  *Id.* at 62-64. According to Muniz, at this meeting Turner told him that he was in the Bronx when the shooting occurred, but did not mention whom he was with.  *Id.* at 64.  Turner also had told Muniz that he wanted to testify before the grand jury and explain this, but Muniz advised against it.  *Id.* at 77-78. Muniz eventually brought in another attorney, Conway Martindale, Esq., to assist on Turner's case. *Id.* at 46.  Martindale met with Turner on October 14, 2014.  *Id.* at 90.  During this meeting, Martindale stated that they discussed Turner's trip to the Bronx on March 11, 2014, but Martindale's understanding was that this occurred before the time of the shooting.  *Id.* at 92.  At the § 440.10 hearing, Turner disputed his attorneys' story.  According to Turner, at his first meeting with Muniz, he told Muniz that he "was nowhere around that shooting" and that "[he] went to [his] cousin William's house."  *Id.* at 32.  Turner also testified that he told Muniz to speak with William to get the names and phone numbers of those that Turner was with when the shooting occurred.  *Id.*

Days and Smith attended Turner's trial.  *See id.* at 10.  Smith testified at the § 440.10 hearing that, during the trial, he approached Turner's attorneys outside the courtroom and asked them why they were not calling him as a witness.  *Id.*  According to Smith, Turner's attorneys told him that "they didn't have to call any witnesses because [the prosecution] didn't prove their case" and "not

to worry." *Id.* at 10-11.

### b. State Court Decision

Following the § 440.10 hearing, Justice Pickholz rejected Turner's claim and found that "[t]he attorneys did not learn of the alibi witnesses until well into the trial." Supplemental Petition, Ex. J at 5. Justice Pickholz noted that if his attorneys had chosen to suddenly call an "unnoticed alibi defense in the middle of trial, there was always the possibility that the prosecution would . . . eviscerate any alibi witness on cross or that other evidence would contradict the alibi witness" and undermine Turner's identification defense, *i.e.*, that he was not the shooter. *Id.* at 6. Thus, "the defense did not learn about the existence of an alibi until it was too late or unwise to use it" and "[i]ndeed, it may always have been unwise to use it." *Id.* at 7. The state court concluded that Turner's "attorneys' investigation of the case was appropriate and their choice of a defense strategically defensible." *Id.* Therefore, the state court held that Turner's attorneys were "not ineffective" and Turner was not prejudiced. *Id.* As noted above, the Appellate Division denied Turner's application for leave to appeal this decision, and the New York Court of Appeals also rejected his attempt to appeal to that court. Supplemental Petition, Exs. N, P.

### c. Discussion

In his supplemental petition to this Court, Turner argues that Justice Pickholz's conclusion was based on four "unreasonable determinations[s] of the facts in light of the evidence presented" for purposes of 28 U.S.C. § 2254(d)(2). Supplemental Petition ¶¶ 51-74. Turner argues that this Court must therefore analyze his ineffective assistance of counsel claim *de novo* and conclude that he has met the *Strickland* test. *Id.* ¶¶ 84-85. The Court disagrees.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and

based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Turner does not show that any of the state court's determinations were "objectively unreasonable."  Instead, he essentially attempts to relitigate these facts and asks this Court to accept his version of the facts instead.  This the Court cannot do under the deferential review standard that applies here.  *See Burt*, 571 U.S. at 15; *Richter*, 562 U.S. at 105. The evidence presented at the § 440.10 hearing was inconsistent in key respects.  Thus, the state court was tasked with wading through this evidence, assessing the credibility of the witnesses who testified before it, and reaching reasonable conclusions.  The court finds that none of Turner's issues with the state court's factual findings amount to an objectively unreasonable determination.

First, Turner argues that the state court erred in determining that Turner never told his attorneys that he had an alibi witness.  Supplemental Petition ¶¶ 51-60.  Turner said he told Muniz at their first meeting that he went to Smith's house, but Muniz denied this.  *Compare* § 440.10 Hearing Tr. at 32 *with id.* at 64.  The state court credited Muniz on this point, Supplemental Petition, Ex. J at 2-3, and the Court cannot say that this was an "objectively unreasonable" determination.

Second, Turner challenges the state court's determination that trial counsel adequately investigated his case.  Supplemental Petition ¶¶ 61-64.  Turner's argument can be readily dismissed. Turner quotes the state court's finding that Muniz conducted an investigation because "[h]e spoke to the defendant, his girlfriend, family and other friends" and "[n]o one told him that the defendant Mr. Turner had been at Smith's house."  Supplemental Petition ¶ 61 (quoting Supplemental Petition, Ex. J at 3).  But Turner argues this was not supported by the record because when asked if he ever "personally as an attorney [did] an investigation for a case," Muniz said "no."  Supplemental Petition ¶ 62 (quoting § 440.10 Tr. at 70).  This stray comment does not change the fact that the

32

record shows Muniz spoke to many individuals about this case, including Turner, his girlfriend, his mother, and his brother.  § 440 Hearing Tr. at 69-70, 73.  This argument fails.

Third, Turner takes issue with the fact that the court concluded Turner returned to his apartment building to change clothes at some point on the night of March 11, 2014.  Supplemental Petition ¶¶ 65-70.  This is significant because it would put Turner in the vicinity of Donnellan Park around the time of the shooting, and thus help to explain why his counsel failed to investigate his Bronx-based alibi.  *See id.* ¶ 65.  In addition to Martindale's testimony that Turner told him this, the court cited video footage and Turner's own statement, both of which placed Turner near Donnellan Park shortly before the shooting.  Supplemental Petition, Ex. J at 5.  The court cannot say that relying on this evidence to draw this conclusion was unreasonable.

Finally, Turner argues that the trial court erred in determining that he admitted to police that he was in the vicinity of Donnellan Park around the time of the shooting.  Supplemental Petition ¶¶ 71-74.  Here, the state court relied on a written statement that Turner gave to the police on June 13, 2014, the day he was arrested.  *See* Supplemental Petition, Ex. H.  In this statement, Turner said that on the night of the shooting he was at a nearby Harlem park and a liquor store and also stopped by Donnellan Park.  *Id.*  Turner did not say in this statement that he was in the Bronx.  *See id.*  The state court's finding here was therefore also not objectively unreasonable.

Further, and without deciding whether *de novo* review of Turner's ineffective assistance of counsel claim would be appropriate here, even if the Court agreed that certain factual determinations were objectively unreasonable, the Court concludes that Turner's claim would fail *Strickland*'s high bar under any standard of review.  Turner seems to argue that his counsel was ineffective in two related ways: first, his counsel failed to investigate his alibi defense, and second, his counsel failed to present this defense at trial.  Little evidence, besides Turner's own

uncorroborated testimony at the § 440.10 hearing, suggests that Turner's attorneys were aware of Turner's supposed alibi before trial.  For example, Turner's statement to police the day he was arrested does not mention that he was in the Bronx or at his cousin's house.  *See* Supplemental Petition, Ex. H.  In his statement, Turner wrote in relevant part as follows: "I was not there when [Rogers] got jumped in the square.  I never made it back.  I was in the battleground having a drink. We went back to the liquor store, stopped by the square, then I left.  When I get back to the square everyone is gone."  *Id.*  This presumably would have been devastating to any Bronx-based alibi defense presented at Turner's trial.  Further, Turner's primary alibi witness, Smith—the man who hired Muniz to represent Turner—confirmed that he did not approach Muniz about testifying on Turner's behalf until trial was already underway.  § 440.10 Hearing Tr. at 15.  Nothing in the record indicates that Smith ever told Muniz he was with Turner prior to this conversation.

Under the first prong of *Strickland*, the Court cannot conclude that Turner's attorneys fell below an "objective standard of reasonableness" by failing to investigate an alibi when Turner's own post-arrest statement was in direct conflict with this supposed alibi.  *Strickland*, 466 U.S. at 688.  Nor was it objectively unreasonable to decline to investigate or advance an unvetted alibi defense brought to counsel's attention during trial.  *See* Supplemental Petition, Ex. J at 6.

Finally, even if *arguendo* Turner's trial counsel was ineffective by failing to investigate or present an alibi defense, on the present record, the Court concludes that Turner did not suffer prejudice under the second prong of *Strickland*.  466 U.S. at 694.  Even if Turner had presented some evidence suggesting that he was at his cousin's house in the Bronx at the time of the shooting, eyewitness Roebuck's grand jury testimony identifying Turner as the shooter would have still been admitted.  Even Rogers—who denied knowing who fired the shot—acknowledged that Turner was at Donnellan Park the night he was shot.  Trial Tr. at 166.  And any alibi presented would have been

severely undercut by Turner's own post-arrest statement that he was in the vicinity of Donnellan Park at time of the shooting, not in the Bronx.  The Court is thus unpersuaded that there is a likelihood that the trial outcome would have been different if counsel had presented an alibi defense.

*     *     *

In sum, the Court finds that each of Turner's claims for ineffective assistance of counsel fail to meet the "high bar" set by *Strickland*.  *Richter*, 562 U.S. at 105 (internal quotation marks and citation omitted).  The Court declines to grant a writ of habeas corpus on this basis.

## IV.  Conclusion

For the reasons set forth above, the Court denies Turner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Furthermore, because Turner has not made "a substantial showing of the denial of a constitutional right," the Court will not issue a certificate of appealability.  28 U.S.C. § 2253(c)(2).

The Clerk of Court is respectfully directed to terminate any pending motions and close this case.

SO ORDERED.

Dated: March 17, 2021
       New York, New York

_____
JOHN P. CRONAN
United States District Judge

35